UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X

HUGH BROWN                                                    :
                                                              :
                                        Plaintiff,            :    **FIRST AMENDED COMPLAINT**
                                                              :
                          -against-                           :    JURY TRIAL DEMANDED
                                                              :
THE CITY OF NEW YORK, POLICE                                  :    CV-14-5372 (BMC)
OFFICERS YLKA MORALES, (tax no.                               :
914384); ROBERT HINES, (shield no. 5991);                    :
ERIC FRANCIS, (tax no. 933784), and                          :
UNDERCOVER POLICE OFFICERS "C00217"                          :
AND "C00209", AND POLICE OFFICERS                            :
"JOHN DOES" nos. 1-4, individually and in                    :
their official capacities (the names "John Doe"              :
being fictitious, as the true names are presently            :
unknown),                                                    :
                                     Defendants.              :
-------------------------------------------------------------- X

Plaintiff, HUGH BROWN, by and through his attorney, **KENNETH F. SMITH, PLLC**, complaining of the defendants herein, respectfully shows the Court and alleges:

### PRELIMINARY STATEMENT

1.     This is a civil rights action in which plaintiff seeks relief for violation of plaintiff's rights as secured by 42 U.S.C. §§ 1981, 1983 and 1988; and the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and the laws of the State of New York.

2.     Plaintiff's claims arise from an incident that took place on or about October 22, 2013, at approximately 865 Hancock Street, Brooklyn, NY during which members of the New York City Police Department ("NYPD") subjected plaintiff to, among other things, false arrest, falsification/manufacture of evidence, failure to intervene and unlawful search and seizure of property.

3.      Plaintiff seeks compensatory and punitive damages, declaratory relief, an award of costs and attorney's fees, pursuant to 42 U.S.C. § 1988, and such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

4.      Jurisdiction of this Court is invoked under 28 U.S.C. § 1343 and 42 U.S.C. §§ 1981 and 1983.

5.      The plaintiff further invokes this court's supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over any and all state law claims and as against all parties that are so related to claims in this action within the original jurisdiction of this court that they form part of the same case or controversy.

6.      Venue herein is proper for the United States District Court for the Eastern District of New York under 28 U.S.C. §1391 (a), (b) and (c), in that a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District of New York.

## JURY DEMAND

7.      Plaintiff demands a trial by jury in this action.

## PARTIES

8.      Plaintiff HUGH BROWN is a resident of Kings County, New York State.

9.      The plaintiff is a fifty-eight year old Jamaican-American male.

10.     Defendant CITY OF NEW YORK ("the CITY") is a municipality organized and existing under the laws of the State of New York. At all times relevant hereto, the CITY, acting through the NYPD, was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the

appointment, training, supervision, and conduct of all NYPD personnel. In addition, at all relevant times, the CITY was responsible for enforcing the rules of the NYPD (and regulations of the NYPD patrol guide), and for ensuring that the NYPD personnel obey the laws of the United States and of the State of New York.

11.     Defendants Police Officers ("POs") YLKA MORALES, (tax no. 914384); ROBERT HINES, (shield no. 5991); ERIC FRANCIS, (tax no. 933784), and UNDERCOVER POLICE OFFICERS ("UCs") "C00217" AND "C00209", are and were at all times relevant herein duly appointed and acting officers, servants, employees and agents of defendant the CITY and/or the NYPD, a municipal agency of defendant the CITY. Defendants Morales, Hines, Francis and UC C00209 and UC C00217 are and were at all times relevant herein acting under color of state law in the course and scope of their duties and functions as officers, agents, servants, and employees of defendant the CITY were acting for, and on behalf of, and with the power and authority vested in them by defendant the CITY and the NYPD, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

12.     The defendant officers are sued in their individual and official capacities.

## STATEMENT OF FACTS

13.     On October 22, 2013, approximately 3:00PM, plaintiff was arrested at 865 Hancock Street, Brooklyn, NY.

14.     Plaintiff was approached by two NYPD officers (defendants "John Does" 1 and 2) who were dressed in plainclothes and not displaying shields or any other indicators that they were police officers.

15.     Said officers approached plaintiff and, without explanation, handcuffed defendant tightly and placed him under arrest.

16.     Defendant police officers John Does 1 and 2 applied handcuffs to plaintiff's wrists very tightly, using force far in excess of that required to effectively prevent the use of hands by the plaintiff.

17.     Defendant officers seized a cell phone belonging to plaintiff, as well as approximately $114 belonging to plaintiff.

18.     Defendant officers transported plaintiff and others arrested ("M.J.", "J.T.", "M.M.", and "M.L.") to the 81 Precinct.

19.     Defendant officers ignored plaintiff's repeated requests that the handcuffs be loosened as they were causing pain and injury to plaintiff's wrists.

20.     Plaintiff suffered pain, and later, bruising and swelling to the wrists as a result of handcuffs being tightly applied.

21.     Defendant Undercover officers C00209 and C00217 drafted sworn statements falsely alleging that plaintiff had provided material assistance to a narcotics transaction by providing a telephone number that was somehow used to facilitate said transaction.

22.     Defendant Morales drafted arrest paperwork listing the basis of plaintiff's arrest as, in sum, acting in concert in the sale of narcotics, and charging plaintiff with the Felony of Criminal Sale of a Controlled Substance in the Third degree, NYPL §220.39.

23.     Defendant Francis, upon information and belief the supervising sergeant, approved, sanctioned, ratified and condoned the arrest by the other defendant officers.

24.     The sworn statements drafted by defendant officers were transmitted to the Kings County District Attorney's office and, upon information and belief, were relied

upon by said representatives in deciding what, if any, criminal charges to bring against plaintiff.

25. Upon information and belief, a representative of the Kings County District Attorney's office had a telephonic conference with defendant Morales before deciding what, if any, charges to bring against plaintiff.

26. As a result of the sworn statements by defendant undercover officers C00209 and C00217, and the unsworn statements my defendant Morales (and other defendants) prosecutors at the Kings County District Attorney's Office charged plaintiff, in a Criminal Court Complaint, with the Class "A" Misdemeanor crime of "Criminal Facilitation in the Fourth degree" (PL §115.00(1)).

27. Plaintiff was in the custody of defendant officers and other members of the NYPD for over twenty-four hours before he was arraigned on said Criminal Court Complaint in Kings Criminal Court, on October 23, 2013, and was released on his own recognizance after entering a plea of "not guilty".

28. After appearing in Kings Criminal Court at least five times to defend himself against the allegations, plaintiff joined in an application by the District Attorney to adjourn the case in contemplation of dismissal under NY CPL §170.55., on June 30, 2014.

## GENERAL ALLEGATIONS

29. The individual defendants acted in concert in committing the above-described acts against plaintiff.

30. Plaintiff was not in possession of narcotics or any other contraband at the time he was arrested.

31.     Plaintiff did not participate in any drug deals at the location, and did not act in concert with anyone at the location for the purpose of committing any illegal acts or for any reason.

32.     Plaintiff did not provide a telephone or a telephone number to any individuals at the time and place alleged, nor did plaintiff contact any third parties by phone (or any other means) for the purpose of facilitating a drug deal during the time and place alleged.

33.     Plaintiff did not resist arrest at any time during the above-described incidents.

34.     Defendant police officers unlawfully stopped plaintiff without reasonable cause to believe that he had committed any crimes, illegally searched plaintiff without reasonable cause to believe he possessed contraband or weapons, illegally arrested plaintiff with no probable cause to believe that he had committed a crime, and illegally seized and searched his phone without a search warrant, in violation of the United States and New York State Constitutions.

35.     The individual defendant officers acted under pretense and color of state law in their individual and official capacities and within the scope of their employment.  Said acts by said defendant officers were beyond the scope of their jurisdiction, without authority or law, and in abuse of their powers, and said defendant officers acted maliciously, willfully, knowingly, and with the specific intent to deprive plaintiff of his rights.

36.     Upon information and belief, defendant Morales illegally and falsely arrested plaintiff approximately four years ago, which arrest led to a prosecution that was dismissed in its entirety.

37. Upon information and belief, plaintiff filed a Civilian Complaint Review Board ("C.C.R.B.") complaint against defendant Morales regarding the false arrest mentioned above.

38. Upon information and belief, the arrest of plaintiff in the instant case by defendant Morales was motivated by Morales' desire to retaliate against plaintiff because plaintiff had filed the CCRB complaint against Morales.

39. Upon information and belief, there exists an official NYPD policy requiring that a supervising officer approve arrests made by non-supervisory officers.

40. Upon information and belief, there exists an official NYPD policy requiring that arrest paperwork (and/or paperwork generated in connection with the arrest of a person) be signed and/or otherwise approved by a supervising officer.

41. Defendant Morales has been sued more than six times in this Court for allegations strikingly similar to those alleged by plaintiff, and in all but one of those lawsuits, defendant CITY has paid money to plaintiffs in return for the withdrawal of plaintiffs' claims.

42. In 09-CV-1245 (The "Henry Case"), defendant Morales and other members of the NYPD were alleged to have unlawfully stopped, detained, searched, strip searched the plaintiffs wholly without probable cause or reasonable suspicion of criminality, but because of plaintiffs' race.

43. In 10-CV-557 (The "Small case"), defendant Morales and other members of the NYPD were alleged to have forcibly entered a residence without probable cause or reasonable suspicion, and unlawfully detained and strip searched and arrested plaintiffs

before seizing personal property and arresting plaintiffs on charges that the District Attorney then declined to prosecute.

44.     In 10-CV-3070 (the "Rose case") defendant Morales and other members of the NYPD were alleged to have forcibly entered a residence without probable cause or reasonable suspicion, unlawfully detained, strip searched and arrested plaintiffs, applying excessively tight handcuffs, before seizing personal property and arresting plaintiffs on charges that were dismissed by a sitting Grand Jury.

45.     In 10-CV-4448 (the "Faulkner case") defendant Morales and other members of the NYPD were alleged to have, unlawfully and without probable cause or reasonable suspicion, detained, searched, arrested, and repeatedly strip searched, and filed false statements against plaintiffs, who were prosecuted before consenting to Adjournments in Contemplation of dismissal.

46.     In 10-CV-4916 (the "Adkins case") defendant Morales and other members of the NYPD were alleged to have unlawfully and without probable cause or reasonable suspicion, detained, searched, arrested, and repeatedly strip searched, and filed false statements against plaintiffs, who were prosecuted before the criminal charges against them were dismissed.

47.     In all the forgoing civil lawsuits against defendant Morales, detailed above in paragraphs forty-one through forty-five, defendant CITY defended defendant Morales.

48.     Therefore, defendant CITY is on notice as to the proclivity of defendant Morales to use excessive force in conducting arrests, arrest people without probable cause or reasonable suspicion, contact and detain persons solely on the basis of their race,

manufacture evidence and swear to false statements in the hope of "justifying" arrests made without probable cause.

49.     Upon information and belief, in spite of the foregoing, defendant CITY has not provided remedial training to defendant Morales, has not adequately supervised defendant Morales, and has utterly failed to discipline defendant Morales for her repeated breaches of NYPD regulations and repeated violations of the constitutional rights of the persons she swore to serve and protect.

50.     Similarly, defendant Francis has been repeatedly sued in this Court for allegations strikingly similar to those now brought by plaintiff, which lawsuits defendant CITY has defended, before settling for money damages.

51.     In 09-CV-5715, defendant Francis and other members of the NYPD were alleged to have unlawfully and without probable cause or reasonable suspicion, detained, searched, arrested, strip searched, and filed false statements against plaintiff, which charges ended in a disposition favorable to the accused.

52.     And in 13-CV-525, defendant Francis and other members of the NYPD were alleged to have unlawfully and without probable cause or reasonable suspicion, detained, searched, assaulted, strip searched, and filed false statements against plaintiff, which charges ended in a disposition favorable to the accused.

53.     Therefore, defendant CITY is on notice as to the proclivity of defendant Francis to use excessive force in conducting arrests, arrest people without probable cause or reasonable suspicion, contact and detain persons solely on the basis of their race, manufacture evidence and swear to false statements in the hope of "justifying" arrests made without probable cause.

54.     Upon information and belief, in spite of the foregoing, defendant CITY has not provided remedial training to defendant Francis, has not adequately supervised defendant Francis, and has utterly failed to discipline defendant Francis for his repeated breaches of NYPD regulations and repeated violations of the constitutional rights of the persons he swore to serve and protect.

55.     Similarly, defendant Hines has been sued in the Southern District of New York for allegations strikingly similar to those now brought by plaintiff.

56.     In 06-CV-709 (the "Anderson" case) defendant Hines and other members of the NYPD are alleged to have arrested plaintiff twice without probable cause or reasonable suspicion, motivated in part by the desire to retaliate against plaintiff, unlawfully detaining, searching, strip searching, manufacturing evidence against and filing false statements against plaintiff.

57.     Both criminal prosecutions alluded to in paragraph fifty-five were dismissed and defendant CITY agreed to pay plaintiff in excess of $51,000 in return for plaintiff's withdrawal of the case.

58.     Therefore, defendant CITY is on notice as to the proclivity of defendant Hines to use excessive force in conducting arrests, arrest people without probable cause or reasonable suspicion, contact and detain persons solely on the basis of their race, manufacture evidence and swear to false statements in the hope of "justifying" arrests made without probable cause.

59.     Upon information and belief, in spite of the foregoing, defendant CITY has not provided remedial training to defendant Hines, has not adequately supervised defendant Hines, and has utterly failed to discipline defendant Hines for his repeated

breaches of NYPD regulations and repeated violations of the constitutional rights of the persons he swore to serve and protect.

60.    Upon information and belief, defendant officers Morales, Francis, Hines, UC C00217 and UC C00209 and other members of the narcotics teams they have worked with in the past, are the subject of CCRB and/or Internal Affairs Bureau ("IAB") complaints and/or investigations.

61.    The actions by defendant officers Morales, Francis and Hines (in the cases already brought before this court—and the S.D.N.Y—and defended by defendant CITY, as well as in the CCRB and/or IAB complaints and/or investigations) demonstrate a continuing need, throughout the NYPD, especially regarding those officers on assignments to arrest persons in their homes for drug offenses, for training in the areas of, inter alia, (a) the rights of people to be secure in their homes and persons, and the legal requirements before those rights can be violated; (b) the probable cause requirement to make an arrest; (c) the appropriate use of force, especially with respect to handcuff use and strip searching; (d) the legal meaning and limitations of the concept of "possession"; (e) the legal implications and prohibition on the filing of false statements in a bid to get convictions.

62.    Defendant CITY is aware of the propensity of defendants Morales, Francis and Hines to make bad choices with respect to situations they commonly encounter in the discharge of their specific duties as narcotics enforcement officers, (such as the probable cause requirement to arrest, appropriate use of force, use of handcuffs, requirement for veracity, etc.) yet despite that awareness, defendant CITY has failed to provide Morales, Francis and Hines with remedial training, has failed to discipline the

officers in any meaningful way, and has failed to provide for increased supervision of the officers, and instead has defended those officers in civil actions, acting as their apologist, and has paid settlement money to plaintiffs alleging violations of constitutional rights by defendant officers.

63.     Upon information and belief, defendant CITY commonly enters into settlement agreements with plaintiffs alleging constitutional violations, which settlement agreements completely deny any violations of any kind by defendant officers.

64.     Upon information and belief, defendant CITY settles cases involving constitutional violations by officers by paying money to plaintiffs in consideration for a general release of liability for the express purpose of being able to subsequently deny any knowledge of the need for increased supervision, training and discipline of the officer in question.

65.     Upon information and belief, defendant CITY settled the prior cases against defendant officers alluded to above for the express purpose of being able to subsequently deny the need for increased supervision, training and discipline of defendants Morales, Francis and Hines.

66.     Despite the practices of defendant CITY detailed above, and despite the strenuous efforts of defendant CITY to bury its head in the sand with respect to the dire need of defendants Morales, Francis and Hines for increased supervision, training and discipline, the CITY is aware of said need for increased training, supervision and discipline by defendants Morales, Francis and Hines and has failed to provide same.

67.     As a direct and proximate result of defendants' actions, plaintiff experienced personal and physical injury, pain and suffering, loss of liberty, fear, an invasion of

privacy, psychological pain, emotional distress, mental anguish, embarrassment, humiliation, and financial loss.

68.    Plaintiff is entitled to receive punitive damages from the individual defendants because the individual defendants' actions were motivated by extreme recklessness and indifference to plaintiff's rights.

### FIRST CLAIM
### (UNLAWFUL SEARCH AND SEIZURE UNDER FEDERAL LAW)

69.    Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

70.    On the above incident date, defendant police officers unlawfully detained, stopped, frisked, patted down, and searched, plaintiff without either reasonable suspicion that plaintiff was committing a crime or probable cause to believe plaintiff had committed a crime.

71.    Additionally defendant officers unlawfully seized property from plaintiff.

72.    Accordingly, defendant officers are liable to plaintiff for unlawful search and seizure under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

### SECOND CLAIM
### (FALSE ARREST UNDER FEDERAL LAW)

73.    Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein

74.    On the above incident date, defendant officers falsely arrested plaintiff without an arrest warrant, probable cause, or any reasonable suspicion that plaintiff had committed or was in the process of committing a crime.

75.     Accordingly, defendant officers are liable to plaintiff for false arrest under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

### THIRD CLAIM
### (FAILURE TO INTERVENE)

76.     Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

77.     On the above described incident date, some of the defendant officers did not have direct contact with plaintiff but had a reasonable opportunity to observe and to prevent the violations of plaintiff's constitutional rights, but they failed to intervene.

78.     Accordingly, those defendant officers are liable to plaintiff for failing to intervene to prevent the violation of plaintiff's constitutional rights.

### FOURTH CLAIM
### (FALSIFICATION OF EVIDENCE)

79.     Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

80.     Defendant officers are liable to plaintiff because, on the above described incident date, they intentionally conspired to fabricate evidence against plaintiff, depriving plaintiff of liberty without due process of law.

81.     Furthermore, defendant officers violated the law by making false statements by drafting and/or signing sworn criminal court complaints and false police reports.

82.     Furthermore, the defendant officers violated the law by manipulating evidence to attempt to obtain a prosecution and unjust conviction, while performing the function of investigators.

83.    Defendant officers were on notice that creating fabricated evidence is a clear violation of law because it well established that individuals who knowingly use false evidence at trial to obtain a conviction act unconstitutionally and that this is redressable in an action for damages under 42 U.S.C. § 1983.

84.    Defendant officers are also liable to plaintiffs because they intentionally created false information likely to influence a fact finder's or jury's decision by, inter alia, forwarding false information to prosecutors, drafting and signing a sworn criminal court complaint and police reports, omitting and/or manipulating evidence, fabricating testimony and evidence, suppressing and concealing exculpatory material and evidence, and forwarding and presenting false information to a prosecutor and/or a court thereby violating plaintiffs' constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.

85.    Accordingly, defendant police officers are liable to plaintiff for falsification of evidence pursuant to 42 U.S.C. § 1983; and the Fifth and Sixth Amendments to the United States Constitution.

### FIFTH CLAIM
### (UNLAWFUL SEARCH AND SEIZURE OF ELECTRONIC INFORMATION UNDER FEDERAL LAW)

86.    Plaintiff repeats and realleges all the foregoing paragraphs as if the same were fully set forth at length herein.

87.    On the above incident date, defendant police officers unlawfully seized plaintiff's cell phone which contained electronically stored cellphone information belonging to

plaintiff without either reasonable suspicion that plaintiff was committing a crime or probable cause to believe plaintiff had committed a crime.

88.      Following the above incident date, defendant police officers accessed, used, observed, looked at, surveilled, evaluated or otherwise used the electronically stored information on plaintiff's cell phone without a search warrant in violation of the Constitutions of the United States of America and the State of New York.

89.      Accordingly, defendant officers are liable to plaintiff for unlawful search and seizure under 42 U.S.C. § 1983; and the Fourth and Fifth Amendments to the United States Constitution.

### SIXTH CLAIM
### (*MONELL* LIABILITY AGAINST DEFENDANT CITY OF NEW YORK UNDER FEDERAL LAW)

90.      The preceding paragraphs are here incorporated by reference.

91.      Defendant CITY directly caused the constitutional violations suffered by Plaintiff, and is liable for the damages suffered by Plaintiff as a result of the conduct of the defendant police officers. The conduct of the defendant officers was a direct consequence of policies and practices of defendant CITY.

92.      Defendant CITY caused Plaintiff to be subjected to First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment violations because the actions of defendant officers were part of the customary practices of the NYPD.  While the NYPD Patrol Guide delineates the appropriate standard for *inter alia*, the probable cause requirement to make an arrest, the appropriate use of force, the need for veracity in the filing of statements, the NYPD has failed to train its officers to comply with this standard.

93.    As a result of the foregoing, plaintiff was assaulted, unlawfully detained and deprived of his liberty, suffered physical injury, great humiliation, costs and expenses, and was otherwise damaged and injured.

94.    All of the acts and omissions by defendant police officers Morales, Francis, Hines and "John Does" 1-4 were carried out pursuant to overlapping policies and practices of the CITY which were in existence at the time of the conduct alleged herein and were engaged in with the full knowledge, consent, cooperation and under the supervisory authority of the City and its agency, the NYPD.

95.    The acts complained of were carried out by the aforementioned defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

96.    The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

> a. Arresting persons known to be innocent in order to meet "productivity goals" (i.e. arrest quotas)
>
> b. Falsely swearing out criminal complaints, and/or lying and committing perjury during sworn testimony
>
>> i. in order to protect other officers; and/or
>>
>> ii. in order to meet said productivity goals;
>
> c. Failing to supervise, train, instruct and discipline · police officers and encouraging their misconduct;
>
> d. Discouraging police officers from reporting the corrupt or unlawful acts of . other police officers;
>
> e. Retaliating against officers who report police misconduct; and
>
> f. Failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented by a supervisor or other agent or employee of the NYPD.

97.    The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

98.    *Schoolcraft v. City of New York*, 10-CV-6005 (RWS) (S.D.N.Y.) (Police officer who exposed a precinct's policies and practices of illegal quotas for the issuance of summonses and arrests, falsifying evidence and suborning perjury alleges he was arrested and committed to a psychiatric facility in retaliation for exposing said policies and practices to the press);

g.    *Long v. City of New York*, 09-CV-6099 (AKH) (S.D.N.Y.); People v. Pagan, 06-H6- 2008 (Sup. Ct., N.Y. Co.) (officer who purposefully swore out a false complaint is convicted of falsifying police records);

h.    *Tayler-Mickens v. City of New York*, 09-CV-7923 (RWS) (S.D.N.Y.) (police officers at the 24th Precinct issue four summonses to a woman in retaliation for her lodging a complaint with the Civilian Complaint Review Board at the precinct;

i.    *Lin v. City of New York*, 09-CV-1936 (PGG) (S.D.N.Y.) (officers arrest person who was lawfully photographing the arrest of a bicyclist in Times Square and swear out a criminal complaint whose facts are contradicted by video evidence[1]);

j.    *Colon v. City of New York*, 09-CV-0008 (E.D.N.Y.) In an Order dated November 25, 2009, which denied the City's motion to dismiss on *Iqbal/Twombly* grounds wherein the police officers at issue were tried and prosecuted for falsifying evidence in a purported buy-and-bust operation, the Honorable District Court Judge Jack Weinstein wrote:

Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by the arresting police officer of the New York City Police

---

[1] For a description of this case and settlement, see, Anahad O'Connor, *City Pays $98,000 to Critical Mass Cyclists N.Y. Times*, March 30, 2010, available at: http://cityroom.blogs.nytimes.com/2010/03/30/city-pays-98000-to-critical-mass-cyclists/?_php=true&_type=blogs&_r=0

Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

k. *People v. Arbeedy*, 06314-2008 (Sup. Ct., Kings Co.) (NYPD narcotics detective found guilty of planting drugs on two innocent civilians; former undercover NYPD narcotics officer, Steve Anderson, testified that fellow narcotics officers routinely; maintained a stash of narcotics to plant on innocent civilians in order to help those' officers meet their arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stick: "*It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach the bodies to it, they're going to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came on to me and I accepted it—being around that so long, and being an undercover.*" The presiding judge, the Honorable Justice Reichbach, stated: "Having been a judge for 20 years, I thought I was not naive regarding the realities of narcotics enforcement. But even the court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly, by the seeming casualness by which such conduct is employed.")

l. *Bryant v. City of New York, 22011/2007* (Sup. Ct., Kings Co.) (jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiffs constitutional right and contributed to her arrest[2]);

m. *Williams v. City of New York*, 06-CV-6601 (NGG), 2009 U.S. Dist. LEXIS [1] 94418 (E.D.N.Y.) (officers arrest plaintiff during a "vertical patrol" of a public housing: project despite evidence that he had a legitimate reason to be on the premises);

n. *MacNamara v. City of New York*, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.) (evidence of perjured sworn statements systematically provided by

---

[2] For a description of this case and ultimate settlement, see, Oren Yaniv, Court rules that cops do use quotas, woman injured in 2006 arrest settles for $75,000, N.Y. Daily News, Feb. 19, 2011, available at http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-settles-75-000-article-1.134856

officers to attempt to cover-up or justify unlawful mass arrests of approximately 1800 people has been and continues, to be developed in the consolidated litigation arising out of the 2004 Republican' National Convention);

o. *McMillan v. City of New York*, 04-CV-3990 (FB) (RML) (E.D.N.Y.) (officers, fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

p. *Avent v. City of New York*, 04-CV-2451 (CBA) (CLP) (E.D.N.Y.) (same);

q. *Smith v. City of New York*, 04-CV-1045 (RRM) (JMA) (E.D.N.Y.) (same);

r. *Powers v. City of New York*, 04-CV-2246 (NGG), 2007 U.S. Dist. LEXIS 2n04 (E.D.N.Y.) (police officer alleges unlawful retaliation by other police officers after testifying about corruption within the NYPD);

s. *Nonnemann v. City of New York*, 02-CV-10131 (JSR) (AJP), 2004 U.S. Dist. LEXIS 8966 (S.D.N.Y.) (former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicionless, racially-motivated stop-and-frisk of a group of Hispanic youths);

t. *Richardson v. City of New York,* 02-CV-3651 (JG) (CLP) (E.D.N.Y.) (officers fabricated evidence, including knowingly false sworn complaints, against an African American man in Kings County and initiated drug charges against him, despite an absence of any quantum of suspicion);

u. *Barry v. New York City Police Department*, 01-CV-10627 (CBM), 2004 U.S. LEXIS 5951 (S.D.N.Y.) (triable issue of fact where NYPD sergeant alleged retaliatory demotion and disciplinary charges in response to sergeant's allegations of corruption within her unit and alleged that the NYPD had an "unwritten but pervasive custom of punishing officers who speak out about police misconduct and encouraging, if not facilitating, silence among officers");

v. *Taylor v. City of New York*, 01-CV-5750(ILG)(MDG) (E.D.N.Y.) (same as *Richardson*; judge at the criminal trial acquitting Mr. Taylor noted, on the record, that he had "significant doubt" about the truthfulness of the officers who testified);

w. *White-Ruiz v. City of New York*, 93-CV-7233 (DLC)(MHO), 983 F.Supp. 365, 380 (S.D.N.Y.1997) (holding that the NYPD had an "unwritten policy or practice of encouraging or at least tolerating a pattern of harassment directed at officers who exposed instances of police corruption"); and

x. *Ariza v. City of New York,* 93-CV-5287 (CPS), 1996 U.S. Dist. LEXIS 20250 at 14 (E.D.N.Y.) (police officer alleges retaliatory duty assignments and harassment in response to his allegations about a racially-discriminatory workplace; on motion for summary judgment, the Court held that the police officer had established proof of both a widespread usage of a policy to retaliate against police officers who expose police misconduct and a failure to train in the police department);

99.     The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of officers lying under oath, falsely swearing out criminal complaints, or otherwise falsifying or fabricating evidence, are further evidenced, inter alia, by the following:

y. The Mollen Commission concluded that police perjury and falsification of official records is probably the most common form of police corruption facing the criminal justice system. It concluded:

> Regardless of the motives behind police falsifications, what is particularly troublesome about this practice is that it is widely tolerated by corrupt and honest officers alike, as well as their supervisors. Corrupt and honest officers told us that their supervisors knew or should have known about falsified versions of searches and arrests and never questioned them[3].
>
> […]
>
> What breeds this tolerance is a deep-rooted perception among many officers of all ranks within the Department that nothing is really wrong with compromising facts to fight crime in the real world. Simply put, despite the devastating consequences of police falsifications, there is a persistent belief among many officers that it is necessary and justifies, even if unlawful. As one dedicated officer put it, police officers often view falsification as, to use his words, "doing God's work" – doing whatever it takes to get a suspected criminal off the streets. This attitude is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of

---

[3] See Mollen Commission Report, page 36

perjury, he asked in disbelief, "What's wrong with that? They're guilty.[4] "

z. In June of 2011, in the case in New York County Supreme Court entitled *People v. William Eiseman* (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pleaded guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another - and training young [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eiseman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here.[5]"

aa. In late 2909, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed," when, in fact, two other officers had made the arrest and handed the arrest off to Mr. Corniel. The suspect was released[6]. Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.

> That's a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.

> What has the authorities particularly troubled is that officers historically have lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught last year stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.

> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies. Sources told The Post their reasons could range from trying to cut down on paperwork to being lazy when filling out arrest and incident reports[7].

---

[4] Mollen Commission Report, pages 40-41
[5] Melissa Grace NYPD Sgt. William Eiseman pleads guilty to lying under oath in plea deal, N.Y. Times June 27, 2011 , available at: http://www.nydailynews.com/news/crime/nypd-sgt-william-eiseman-pleads-guilty-lying-oath-plea-deal-article-1.129288.
[6] Murray Weiss *NYPD in a Liar Storm* N.Y. Post, October 26, 2009, available at: http://nypost.com/2009/10/26/nypd-in-a-liar-storm/
[7] *Id.*

bb. In 2007, former NYPD Officer Dennis Kim admitted to accepting money and sexual favors from the proprietor of a brothel in Queens County in exchange for protecting that brothel. Mr. Kim was convicted for those offenses. The 109th precinct of the NYPD, which used to be Mr. Kim's command, is also under investigation by the United States Attorney's office for "plant[ing] drugs on suspects and steal[ing] cash during gambling raids." The 109th precinct is believed to be involved in a practice known as "flaking" wherein police officers plant drugs on suspects in order to bring legitimacy to an arrest. According to Assistant United States attorney Monica Ryan, members of the 109th precinct maintained a small stash of drugs in an Altoids tin for this purpose."[8]

cc. In December of 2009 two officers from the 81st Precinct in Brooklyn arrested and falsely swore out charges against an undercover officer from the Internal Affairs Bureau. As explained in an article in the New York Post:

> The officers were snared in a sting by Internal Affairs in December when they were told to keep an eye out for people selling untaxed cigarettes in their precinct.
>
> Sometime later, they saw a man hanging out on a corner in the neighborhood and found that he was carrying packs of knock-off smokes.
>
> [Sgt. Raymond] Stukes, 45, and (Officer Hector] Tirado, 30, cuffed him, but then claimed that they had seen him selling the bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody was an undercover corruption investigator and that the whole incident was caught on video.
>
> To complete the ruse, the undercover cop was processed at the station house so as not to tip off Stukes and Tirado about the sting.
>
> Police sources said [this action] stem[s] from precinct commanders caving to the pressure of top brass to make themselves look better.

---

[8] John Marzulli, *Claims of Corruption at Queens Precinct Put Crooked Cop's Sentencing on Hold*, New York Daily News, June 20, 2008, *available at*: http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352

"There's pressure on the cops from the bosses and they're getting pressured from headquarters, a police source told The Post.[9]

The officers were indicted for felony perjury, filing a false report and filing a false instrument[10].

dd. In early 2010, the City settled a civil rights lawsuit wherein Police Officer Sean Spencer[11] falsely arrested and accused a 41 year old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted "Officer Spencer falsely reported to the Assistant District Attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that the plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested for this offense.[12]

ee. Separate Grand Jury investigations into drug-related police corruption in the Bronx and Manhattan revealed that more than a dozen officers had been breaking onto drug dealers' apartments, stealing and then selling their drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed during a four-month investigation by the New York Newsday said they believe those two grand jury investigations—in the 46th Precinct in University Heights section of the Bronx and the 34th Precinct—are not isolated instances. They say the investigations reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[13]

100. Furthermore, the existence of the aforesaid unconstitutional customs and policies, specifically with regard to "productivity goals," may be further inferred from the following:

---

[9] Larry Celona and Tim Perone, *Cops Sting Cops*, N.Y. Post, July 30, 2010, *available at:* http://nypost.com/2010/07/30/cops-sting-cops/

[10] John Marzulli *Brooklyn Cops Charged With Barging Into Sting Operation, Arresting a Fellow Officer on Bogus Charges*, N.Y. Daily News, July 30, 2010, *available at:* http://www.nydailynews.com/new-york/brooklyn-cops-charged-barging-sting-operation-arresting-fellow-officer-bogus-charges-article-1.204251

[11] In sum, the City has paid more than $80,000 to settle four federal lawsuits against Officer Spencer. John Marzulli, *City Shells Out $35G To Grandmother, Monica Gonzalez, Busted As Hooker*, N.Y. Daily News, January 7, 2010, *available at:* http://www.nydailynews.com/new-york/city-shells-35g-grandmother-monica-gonzalez-busted-hooker-article-1.459661

[12] *Id.*

[13] David Kocieniewski and Leonard Levitt, *When the Finest Go Bad: DAs, Others Say Department Overlooks Corruption*, New York Newsday, November 18, 1991, at 6.

ff. Deputy Commissioner Paul J. Browne has repeatedly admitted that the NYPD commanders are permitted to set "productivity goals."[14]

gg. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is …summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD's Stop, Question and Frisk reports.  She added, "The bottom line is everybody's individual activity is being looked at."  Later in the recording—made during a roll call in 2010 at Transit District 34 in Coney Island—she said only officers with "good productivity" will get the opportunity to work overtime.  She also said that Capt. James Sherrin wanted every officer to make at least one arrest per month—up from a previous order of one every three months—because crime had spiked and arrest totals were lower than the other transit districts.  "He wants everybody to get in the mindset that there's no more 'collar a quarter,'" Williams said.[15]

hh. NYPD Officer Adil Polanco has asserted that his command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty summonses" per month.  P.O. Polanco's allegations were confirmed by an audiotape obtained by the media.  The contents of the tape reveal that these quotas are enforced through coercion and threats of job loss, *to wit*, a patrol supervisor at the 41st Precinct is overheard saying: "If you think one and twenty is breaking your balls, guess what you'll be doing?  You're going to be doing a lot more, a lot more than what they're saying."  The tape also reveals that another patrol supervisor chimed in and told the officers: "Next week, twenty-five and one, thirty-five and one, and until you decide to quit this job and go to work at Pizza Hut, this is what you're going to be doing 'til then."[16]

ii. The New York Daily News obtained and published two internal memos which were posted inside the roll-call room at the NYPD's 77th Precinct.  The memos specifically instructed officers about "number of tickets to give drivers for cell phone, seat-belt, bus stop, tinted windows, and truck route violations they were expected to issue.  The memos remained posted for several weeks in the roll-call room until the media began inquiring.[17]

---

[14] Jim Hoffer, *NYPD Officer Claims Pressure To Make Arrests*, WABC-TV Eyewitness News, March 2, 2010, *available at* http://7online.com/archive/7305356/

[15] Rocco Parascandola, *NYPD Lt. Janice Williams Captured On Tape Pushing For More Busts, But Brass Says There's No Quota*, N.Y. Daily News, March 3, 2011, *available at*: http://www.nydailynews.com/new-york/nypd-lt-janice-williams-captured-tape-pushing-busts-brass-quotas-article-1.116880

[16] *Id.*

[17] James Fanelli, *Cops At Brooklyn's Crime-Ridden 77th Precinct Told To Meet Quotas For Moving Violations, Memos Say*, N.Y. Daily News, Nov. 8, 2010, *available at*: http://www.nydailynews.com/new-york/cops-brooklyn-crime-ridden-77th-precinct-told-meet-quotas-moving-violations-memos-article-1.452621

jj. Responding to a query from a civilian who was cited on consecutive days in November of 2009 for allegedly occupying more than one seat on the New York City subway, the officer responded: "Recently we've been told to write tickets instead of give warnings for this type of thing." The officer explained that they needed to meet quotas.[18]

kk. In December of 2010 and in response to the pressure from their supervisors to write baseless summonses pursuant to the policy and practice of "quotas," police officers at the 79th Precinct considered organizing a so-called "daylong summons boycott." As one officer at the precinct explained, "Nobody feels this is right, asking us to write summonses just to meet a quota."[19]

ll. In response to the planned summons-boycott at the 79th Precinct, on December 13, 2010, Deputy Chief Michael Marino marched into the precinct at roll call with a Deputy Inspector and read officers the riot act. "Just try it," a police source quoted Marino as saying, "I'll come down here and make sure you write them." Marino also vowed to transfer people, just like he did when he was the commanding officer of the 75th Precinct in East New York.[20]

mm. Capt. Alex Perez, the second in command at the NYPD's 8151 Precinct, testified in a civil matter before a Brooklyn Supreme Court jury that officers are likely to get poor performance ratings if they have few arrests, conceding that that arrest numbers are a factor in evaluating an officer's performance.[21] Ultimately, the jury in that case ruled that the police had a policy "regarding the number of arrests officers were to make, that violated plaintiffs constitutional rights and contributed to her arrest."[22]

nn. The New York City Office of Collective Bargaining concluded that officers in Brooklyn's 75th Precinct were required to issue four parking tickets, three moving violations citations, three "quality of life" summonses, make one arrest and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that the NYPD maintained an illegal "summons quota for

[18] Tom Nanako and Kirsten Fleming, *Nighttime Riders In Big Sit Fit*, The New York Post, December 26, 2009, *available at:* http://nypost.com/2009/12/26/nighttime-riders-in-big-sit-fit/

[19] Rocco Parascandola, *Irate Cops at the 79th Precinct in Bedford Stuyvesant Threaten Boycott Over Quotas*, N.Y. Daily News, December 12, 2009, *available at*: http://www.nydailynews.com/crime/irate-cops-79th-precinct-bedford-stuyvesant-threaten-boycott-quotas-article-1.474648

[20] Rocco Parascandola, *Deputy Chief Michael Marino Threatens Cops at the 79th Precinct Who Want To Go On Summons Strike*, N.Y. Daily News, December 15, 2010, *available at*: http://www.nydailynews.com/new-york/deputy-chief-michael-marino-threatens-cops-79th-precinct-summons-strike-article-1.472513

[21] William J. Gorta, *Brooklyn Mom's Suit Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15, 2011 at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. 15 2011, at 20, also available at Westlaw on WLNR 2986205.

[22] Oren Yaniv, *Court Rules That Cops Do Use Quotas, Woman Injured In 2006 Arrest Settles for $75,000*, N.Y. Daily News, Feb. 19, 2011, *available at*: http://www.nydailynews.com/news/crime/court-rules-cops-quotas-woman-injured-2006-arrest-settles-75-000-article-1.134856

traffic violations in the precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the City to cease and desist from the practice.[23]

oo. Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the North Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to the New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.
>
> "You can't make the nine dollars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News.
>
> Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.
>
> Creighton then told the cops to "finagle" the times of the arrests so any overtime was paid for by a federally funded anti-drug program, the complaint alleges.
>
> Unbeknownst to Creighton, one officer had his NYPD radio switched on—so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by a 911 dispatcher.[24]

101. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the failure to supervise, train, instruct and discipline police officers and encouraging their misconduct, are further evidenced, inter alia, by the following:

pp. The Report of the Commission To Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

---

[23] *New York City Ticket Quota Confirmed, Denied*, The Newspaper.com, January 21, 2006, *available at*: http://www.thenewspaper.com/news/09/914.asp; see also, Kirsten Cole, *NYPD's Bogus Little Secret: Parking Ticket Quotas—Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at*: http://passaicnews.wordpress.com/2007/08/15/nypds-bogus-little-secret-parking-ticket-quotas/

[24] Allison Gendar, *NYPD Captain Allegedly Caught In Arrest Quota Fixing*, The New York Daily News, November 14, 2007, *available at*: http://www.nydailynews.com/news/crime/nypd-captain-allegedly-caught-arrest-quota-fixing-article-1.256006

> In the face of this problem [of corruption] the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate, than the devastating consequences of corruption itself. As a result, its corruption control minimized, ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputation tainted—especially a department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment, and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority—which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[25]

qq. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

rr. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in *Colon v. City of New* York, 09-CV-00008 (E.D.N.Y.), in which he noted a "widespread…custom or policy by the City approving illegal conduct" such as lying under oath and false swearing, then NYPD Commissioner Raymond Kelly acknowledged, "When it [corruption] happens it's not for personal gain. It's more for convenience."[26]

ss. Regarding the City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[27] When it does, however, it

---

[25] Mollen Commission Report, pp 2-3, *available at*: http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commission%20-%20NYPD.pdf

[26] Oren Yaniv and John Marzulli, *Kelly Shrugs Off Judge Who Slammed Cops*, The New York Daily News, December 2, 2009, *available at*: http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710

[27] In 2006, out of more than 10,000 allegations that were fully investigated, the CCRB substantiated only 594 (about six percent). Similarly, in 2007, out of more than 11,000 allegations that were fully investigated, the CCRB substantiated only 507 (about five percent). In 2013, out of the more than 5410 allegations that were fully investigated, the CCRB substantiated about fourteen percent. *See* CCRB Jan.-Dec. 2007 Status Report at p 19, and CCRB 2013 Status report *available at*: http://www.nyc.gov/html/ccrb/downloads/pdf/CCRB%20Annual_2013.pdf.

has been the custom and practice to vest sole control over whether the NYPD pursues the matter with the Police Commissioner, who is also the sole person with authority to impose discipline on the subject officer(s). During Police Commissioner Ray Kelly's tenure, since 2005, only one quarter of the officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e. closed without discipline or any kind of action) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in 2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by CCRB in 2009.[28] As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by the NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[29]

102. The existence of the aforesaid unconstitutional customs and practices, specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct are further evidenced, inter alia, by the following:

tt. Former longtime New York City District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

uu. In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the "code of silence" in the NYPD;

vv. Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence, is reinforced in every way."

---

Upon information and belief, the low rate of substantiated complaints is due in part to the above noted *de-facto* policy and/or well-settled and widespread custom and practice in the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony and statements given to the CCRB, to cover up civil rights violations perpetrated by themselves or fellow officers, supervisors and/or subordinates.

[28] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009, at A19, available at: http://cityroom.blogs.nytimes.com/2009/10/05/few-results-for-reports-of-police-misconduct/?_php=true&_type=blogs&_r=0

[29] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

103. The existence of the above-described unlawful de-facto policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the City, including, without limitation, Police Commissioner William Bratton, and his predecessor, Raymond Kelly.

104. The actions of defendant officers Morales, Francis, Hines and "John Does" 1-4 resulted from and were taken pursuant to the above mentioned de facto policies and/or well-settled and widespread customs and practices of defendant CITY, which are implemented by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Police Commissioner Bratton who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, inter alia, in sworn testimony, official reports, in statements to the CCRB and the IAB, and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves or fellow offices, supervisors and/or subordinates against those civilians.

105. All of the foregoing acts by defendants deprived plaintiff of his federally protected rights, the constitutional rights enumerated above.

and ratify and endorse said false story. Pursuant to the aforementioned City policies, practices and/or customs, other officers failed to intervene in or report defendant officers' violations of plaintiff's rights.

110. Plaintiff's injuries were a direct and proximate result of defendant CITY and the NYPD's wrongful de facto policies and/or widespread and well-settled customs and practices and of the knowing and repeated failure of the defendant CITY and the NYPD to properly supervise, train and discipline their police officers.

111. As a result of the foregoing, plaintiff was assaulted, unlawfully detained and arrested, deprived of his liberty, subjected to the criminal justice system, incurred legal fees, suffered great humiliation, costs and expenses, and was otherwise damaged and injured.

106.   Defendant CITY knew or should have known that the acts alleged herein would deprive plaintiffs of his rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

107.   Defendant CITY is directly liable and responsible for the acts of defendant officers Morales, Francis, Hines and "John Does" 1-4, because it repeatedly and knowingly failed to properly supervise, train instruct and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulation of the CITY and the NYPD and to require compliance with the Constitution of the United States.

108.   Despite knowledge of such unlawful de facto policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including then Commissioner Ray Kelly, have not taken steps to terminate these policies, practices and/or customs or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

109.   The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers are evidenced by, inter alia, the police misconduct detailed herein.  Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, defendant officers Morales, Francis, Hines and "John Does" 1-4 felt empowered to arrest plaintiff without probable cause and then fabricate and swear to a false story to cover up the blatant violations of plaintiff's constitutional rights, and supervising officer John Doe no. 1 felt empowered to sanction

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff demands a jury trial and the following relief, jointly and severally against the defendants:

a. Compensatory damages in the amount of One Million Dollars ($1,000,000);

b. Punitive damages in the amount of Two Million Dollars ($2,000,000);

c. Costs, interest and reasonable attorney's fees, pursuant to 42 U.S.C. § 1988; and,

d. Such other and further relief as this Court may deem just and proper, including injunctive and declaratory relief.

DATED:      Brooklyn, New York
            November 25, 2014

KENNETH F. SMITH, PLLC
16 Court Street, Suite 2901
Brooklyn, New York 11241
(646) 450-9929
kfslawfirm@gmail.com
*ATTORNEY FOR PLAINTIFF*